<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RUMULO GREGORIO,<br><br>               Petitioner,<br><br>         v.<br><br>BRUCE DAVIS, et. al.,<br><br>             Respondents. | Civil Action No. 19-14429 (BRM)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is the petition for a writ of habeas corpus ("Petition") of Petitioner Rumulo Gregorio ("Petitioner") brought pursuant to 28 U.S.C. § 2254. (ECF No. 1.) Following an order to answer, Respondents filed a response to the petition (ECF No. 9) and Petitioner filed a reply (ECF No. 10). For the reasons set forth below, Petitioner's habeas petition is **DENIED**, and no certificate of appealability shall issue.

I.   **BACKGROUND**

The New Jersey Superior Court, Appellate Division provided the following factual summary on direct appeal:[1]

> Some ten years before the homicide, [Petitioner] met Clarissa and her husband through a bowling league and became a friend of the family. He came to know all four of the Mariano children, who were adults at the time relevant to the charges. [Petitioner] went by the nickname "J.R."
>
> Clarissa's husband died in March 2008. Clarissa and some family members moved to a house in Jersey City that was within walking

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

distance of [Petitioner]'s home. Clarissa lived on the second floor of her Jersey City house, her son Christopher lived with his wife and child on the first floor, and Clarissa's sister lived on the third floor. In 2009, the youngest of the children, Christine, graduated from culinary school in Florida and moved in with her mother on the second floor.

Clarissa and [Petitioner] had begun dating in late 2008, but the relationship quickly faltered. Clarissa wanted [Petitioner] to pursue an education, get a job, and follow their religion. [Petitioner] did not comply with her wishes. After a series of temporary breakups, Clarissa ended the dating relationship permanently during the first week of August 2009. Afterwards, [Petitioner] would wait at the end of her block and approach her "practically every day." Clarissa rebuffed him repeatedly, but [Petitioner] refused to accept her decision.

[Petitioner] called and sent many text messages to Clarissa each day in August 2009, totaling more than 300 texts through August 25th, at which time Clarissa changed her phone number. The messages expressed his desperation and anger about the breakup and his wish that she would suffer as he was suffering. When she told him to stop, he texted back that he would "not stop until one of us dies."

In mid-August, Christine was outside walking her dogs and talking on her cell phone to her boyfriend, Brandon Bigham, who lived in another state. Bigham had spent time in the company of the Mariano family and [Petitioner], and so, he was familiar with [Petitioner]'s voice. During the mid-August telephone call, Bigham heard Christine say, "that's weird, I see J.R." According to Bigham's testimony he then overheard [Petitioner] say, "if I don't get to talk to your mom, I'll burn the house down. . . ." Uncertain of [Petitioner]'s exact words, Bigham added, "or something like that." Bigham did not report what he heard to the police or anyone else at the time because he thought Christine and her mother would deal with it themselves.

When Clarissa decided to change her home phone number and all of the cell phone numbers on the family's plan, Christine persuaded her not to change Christine's cell phone number because she wanted to remain in touch with her out-of-state friends. [Petitioner] then began calling Christine as a way to reach Clarissa.

During August 2009, [Petitioner] attempted several times to enter Clarissa's house although he was not welcome. On one occasion when Clarissa returned from church, Christine was outside and

frantically pulled her into the house because [Petitioner] was waiting outside. Christine then sent her brother Christopher out to confront [Petitioner]. After a tense but muted exchange between the two men, [Petitioner] left.

On the morning of September 1, 2009, Clarissa left for work early in the morning but first saw Christine briefly and spoke to her. At 7:36 a.m., Clarissa sent a text message to [Petitioner] asking "what he was up to." Clarissa testified at the trial that she sent this message because she "had that fear that it was just too quiet, nothing was going on, and [she] really wanted to know what he was up to." [Petitioner] did not respond to Clarissa's text until later that day.

Meanwhile, Christopher and his wife also went to work, and Clarissa's sister was the last to leave the Jersey City house that morning, activating the house alarm as she left. Bigham called Christine at about 10:00 a.m. and woke her from her sleep. He was on the phone with her when he heard the doorbell ring at Christine's house. He then overheard Christine speaking with [Petitioner] over the door intercom. He heard [Petitioner] say, "I have something to give your mom," and Christine answered, "give it to me and I'll give it to her." At that point, the "phone call disconnected without Christine saying goodbye. Bigham never spoke to Christine again. Near mid-day on September 1, 2009, [Petitioner] called Clarissa on her new cell number, which she testified she had not realized he would have as a result of the text she sent earlier that morning. During the conversation, Clarissa heard hammering noises. [Petitioner] said he was fixing a roof leak.

When Clarissa returned home from work on September 1, she noticed that Christine's car was parked outside although she expected Christine to have left by then to start her 4:00 p.m. work shift in a restaurant. As Clarissa stepped out of her car, [Petitioner] greeted her. He said he was not going to hurt her; he was there to help Clarissa with her bags. She refused his offer. When Clarissa approached the house, she heard the security system saying the word "fire." [Petitioner] asked Clarissa to give her house keys to him. He opened the door, and she followed him into the house.

[Petitioner] and Clarissa searched the house for fire and for Christine. Christine was not in the kitchen, in her room, or in the bathroom. [Petitioner] re-leased Christine's dogs from a balcony, which was an indication to Clarissa that Christine must be in the house because she would not leave her dogs outside on the balcony when she was not home. Clarissa went to her own room and was surprised to see her door closed. She had trouble opening the door,

and when she did, the room was filled with black smoke. [Petitioner] pulled Clarissa outside by her clothing, saying at the same time, "I'm so sorry if Christine is there."

Construction workers at the house next door called 911. Clarissa wanted to call her children but did not have her cell phone. [Petitioner] handed her a cell phone that Clarissa recognized as Christine's phone. Clarissa asked him where he got the phone, and [Petitioner] said he had just found it.

Firefighters arrived and put out the fire. In Clarissa's bedroom, lying face up on the bed, they found Christine's charred body. Later, an autopsy revealed that Christine had been killed before the fire started. There was no evidence of smoke in her lungs or bronchial tubes. She had a traumatic injury to the back of her head and evidence that her throat had been compressed. The medical examiner concluded that Christine had been killed by strangulation but could not determine a time of death. No DNA other than her own was found on Christine's body, thus negating a theory that she had been sexually assaulted. There was no evidence of theft from the home.

Police and fire investigators concluded the fire had been deliberately set at two locations in the bedroom, on the bed under Christine's legs and in a closet. Evidence of acetone, a flammable substance commonly found in nail polish remover, was detected in the area where the fire originated on the bed. The investigators found a cigarette lighter discarded in a waste basket in the bedroom. A smoke alarm was on the floor in the hallway, and it appeared to have been removed from the ceiling. Also, what appeared to be the remains of an open bible were found on the bed.

Later that night, [Petitioner] was arrested at the scene of the fire. No cigarettes were found on [Petitioner]'s person, but he was known to be a smoker, and he had a lighter in his possession when he was arrested.

(ECF No. 9-6, *State v. Gregorio*, No. A-5383-11T1 at 3-8 (N.J. Super. Ct. App. Div. April 24, 2015).)

The Hudson County Grand Jury returned Indictment No. 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, charging Petitioner with murder, N.J.S.A. § 2C:11-3(a)(1) or (2) (count one); second-degree aggravated arson,

N.J.S.A. § 2C:17-1(a)(2) (count two); fourth-degree stalking, N.J.S.A. § 2C:12-10(b) (count three); and third-degree terroristic threats, N.J.S.A § 2C:12-3(a) (count four). (ECF No. 9-2.)

Before trial, Petitioner moved to sever the murder and arson charges from the stalking and terroristic threats charges. The trial court held a hearing and denied Petitioner's motion, finding the evidence of stalking and threats would be admissible as relevant to motive for the murder and arson charges even if the stalking and threats were tried separately. (*See* ECF Nos. 9-19, 9-20.)

On January 19, 2012, Petitioner's jury trial began before the Honorable Paul M. DePascale, J.S.C. (*See* ECF Nos. 9-21, 9-22, 9-23, 9-24, 9-25, 9-26, 9-27.) On February 2, 2012, the jury found Petitioner guilty on all counts. (*See* ECF No. 9-27.) On April 30, 2012, Petitioner was sentenced to a total term of fifty-years imprisonment, subject to the No Early Release Act ("NERA"). (*See* ECF No. 9-28.)

Petitioner filed a Notice of Appeal with the Appellate Division. (ECF No. 9-4.) On April 24, 2015, the Appellate Division affirmed Petitioner's convictions. (ECF No. 9-6, *Gregorio*, No. A-5383-11T1.) On November 25, 2015, the New Jersey Supreme Court denied Petitioner's petition for certification. (ECF No. 9-8, *State v. Gregorio*, 127 A.3d 702 (Table) (2015).)

On January 14, 2016, Petitioner filed a post-conviction relief ("PCR") petition. (ECF No. 9-9.) On March 9, 2017, following a hearing, the PCR court denied Petitioner's PCR petition by way of oral opinion. (*See* ECF No. 9-29.) On May 4, 2017, Petitioner filed a Notice of Appeal before the Superior Court, Appellate Division. (ECF No. 9-13.) On March 19, 2018, the Appellate Division affirmed the denial of Petitioner's PCR petition. (ECF No. 9-16, *State v. Gregorio*, No. A-3690-16T4 (N.J. Super. Ct. App. Div. March 19, 2018).) On October 5, 2018, the New Jersey Supreme Court denied Petitioner's petition for certification. (ECF No. 9-18, *State v. Gregorio*, 194 A.3d 99 (Table) (2018).)

Petitioner filed his instant habeas petition with this Court, which was signed on June 26, 2019. (ECF No. 1.) Petitioner asserts the following ground for relief:

1. The court erred in failing to provide the jury with a limiting instruction contrasting the permitted and prohibited purpose for which the jury might use the evidence of [Petitioner's] history of stalking and threatening Clarissa;

2. The court erred in admitting Brandon Bingham's testimony about [Petitioner's] prior threat to burn down the Mariano home;

3. Petitioner was denied his Sixth Amendment right to counsel:

   a. [Trial counsel] was ineffective for failing to speak to several witnesses and call them as witnesses for the defense;

   b. Trial counsel was ineffective for failing to request a passion provocation jury instructions; and

   c. Trial counsel was ineffective for failing to make timely objections at trial.

(*See* ECF No. 1.) Respondents filed an answer asserting Petitioner's claims are meritless. (ECF No. 9.)

## II.   LEGAL STANDARD

Under the current version of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, the district court "shall entertain an application for writ of habeas corpus in [sic] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Habeas petitioners bear the burden of establishing their entitlement to relief for each claim presented in a petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, 132 S. Ct. 2148, 2151 (2012).

District courts are required to "generally defer" to the determinations of the state trial and appellate courts. *Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States: or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In this context, "[c]ontrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in United States Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from United States Supreme Court precedent and arrived at a different result than the United States Supreme Court. *Eley*, 712 F.3d at 846 (*citing Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Federal law is established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. *Eley*, 712 F.3d at 846 (*quoting Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010)).

"When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods*, 125 S. Ct. at 1376. Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a

7

factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Furthermore, "[w]hen a state court arrives at a factual finding based on credibility determinations, the habeas court must determine whether that credibility determination was unreasonable." *See Keith v. Pennsylvania*, 484 F. App' x 694, 697 (3d Cir. 2012) (*citing Rice v. Collins*, 546 U.S. 333, 339 (2006)).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To do so, a petitioner must "'fairly present' all federal claims to the highest state court before bringing them in federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002)). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *Id.* (citing *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)).

Even when a petitioner properly exhausts a claim, a federal court may not grant habeas relief if the state court's decision rests on a violation of a state procedural rule. *See Johnson v. Pinchak*, 392 F.3d 551, 556 (3d Cir. 2004). This procedural bar applies only when the state rule is "independent of the federal question [presented] and adequate to support the judgment." *Leyva*, 504 F.3d at 365–66 (citing *Nara v. Frank*, 488 F.3d 187, 196, 199 (3d Cir. 2007); *see also Gray v. Netherland*, 518 U.S. 152 (1996), and *Coleman v. Thompson*, 501 U.S. 722 (1991)). If a federal court determines that a claim has been defaulted, it may excuse the default only upon a showing of "cause and prejudice" or a "fundamental miscarriage of justice." *Leyva*, 504 F.3d at 366 (citing *Lines v. Larkins*, 208 F.3d 153, 166 (3d Cir. 2000)).

### III.    DISCUSSION

### A.  Ground One: Jury Instruction

In ground one, Petitioner argues the trial court erred by failing to provide the jury with a limiting instruction contrasting the permitted and prohibited purpose for which the jury might use the evidence of Petitioner's stalking and threatening Clarissa. (ECF No. 1 at 6.)

By way of background, prior to trial, the court held an evidentiary hearing regarding Petitioner's motion to sever the murder and aggravated arson counts from the stalking and terroristic threats counts. (*See* ECF No. 9-19, Pretrial Hearing Transcript 8/9/11.) The trial court denied Petitioner's motion, finding the hundreds of text messages Petitioner sent to Clarissa prior to Christine's murder and Christopher's testimony regarding Petitioner's unwanted advances towards Clarissa were admissible. (*See* ECF No. 9-20, Pretrial Hearing Transcript 1/18/12.) The trial court found the evidence was probative of Petitioner's motive for Christine's murder. (*Id.* at 13:21-23.) The trial court found the evidence was close in time, similar in nature, and was "a continuous series of events initiated by [Petitioner] to achieve a specific goal." (*Id.* at 13:24 to 14:3.) The court explained the threats and stalking:

> [A]ll had a single purpose to insult, harass, and inflict emotional distress upon Clarissa. The proofs establish [Petitioner's] deteriorating emotional state which lead to the homicidal act and concealment by arson.

(*Id.* at 14:15-9.) The trial court found there was "little prejudice to [Petitioner] insofar as the evidence sought to be admitted on the homicide is clearly admissible on the stalking and terroristic threats counts." (*Id.* at 15:2-9.)

On direct appeal, the Appellate Division reviewed Petitioner's claim that the trial court erred in failing to provide the jury with a limiting instruction and found it meritless. (ECF No. 9-6, *Gregorio*, No. A-5383-11T1 at 13-19.) The Appellate Division noted that Petitioner was arguing

that the trial court was required to give the jury a limiting instruction that it could not use the stalking and threats evidence to conclude that Petitioner had a disposition to commit crimes and therefore murdered Christine and set the fire. (*Id.* at 13.) The Appellate Division explained:

> Evidence rule 404(b), however, does not apply to the challenged trial evidence in this case. The rule provides, in relevant part:
>
>> [E]vidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted *in* conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.
>
> [ N.J.R.E. 404(b).]
>
> When Rule 404(b) controls the admission of evidence, the court must apply the four-part test established in *State v. Cofield*, 127 N.J. 328, 338 (1992). In addition, the court must give the jury a carefully formulated limiting instruction on the proper use of such evidence of uncharged wrongful conduct of the defendant. *Id.* at 340-41. Preferably, such a limiting instruction should be given both at the time the evidence is disclosed to the jury and at the end of the case. *See State v. Angoy*, 329 N.J. Super. 79, 89-90 (App. Div.), certif. denied,165 N.J. 138 (2000).
>
> In this case, N.J.R.E. 404(b) did not control admission of the challenged evidence once the court decided that all the charges would be tried jointly. Stalking and terroristic threats were charged crimes for the jury's consideration and not "other crimes, wrongs, or acts." The jury was not exposed to evidence of uncharged crimes to prove "defendant's criminal disposition as basis for proving guilt of the crimes charged." *State v. Koskovich*, 168-448, 482 (2001). A limiting instruction such as the model jury charge for Rule 404(b) evidence would only have confused the jury with its several references to "other crimes, wrongs, or acts." *See* Model Jury Charge (Criminal), "Proof of Other Crimes, Wrongs, or Acts (N.J.R.E. 404(b))" (2007).
>
> The evidence of the text messages and other contacts initiated by [Petitioner] was directly admissible as proof of the third and fourth counts of the indictment. In addition, it was admissible as part of the

> State's proof of a sequence of acts that allegedly led directly to [Petitioner's] intrusion into Clarissa's house on September 1, 2009, and the resulting homicide of Christine and burning of the house. In *State v. Rose*, 206 N.J. 141, 179 (2011), the Court held that a threshold determination must be made before applying Rule 404(b) either to admit or to exclude evidence: "whether the evidence relates to 'other crimes,' and thus is subject to continued analysis under Rule 404(b), or whether it is evidence intrinsic to the charged crime, and thus need only satisfy the evidence rules relating to relevancy, most importantly Rule 403."

(ECF No. 9-6, *Gregorio*, No. A-5383-11T1 at 13-16.)

The Appellate Division found the threats and stalking were "highly relevant to [Petitioner's] motive and state of mind that led to the murder and arson." (*Id.* at 16.) The state court found:

> In the pretrial hearing on the question of whether the murder and arson charges should be severed for trial, the court was correct in analyzing the stalking and threats evidence under Rule 404(b). *See State v. Pitts*, 116 N.J. 580, 601-02 (1989). Once the court determined that the evidence would be admissible in support of the murder and arson charges, the standard for determining its admissibility in the joint trial was controlled by N.J.R.E. 403, not N.J.R.E. 404(b).

(*Id.* at 17.) Finally, the Appellate Division found that had trial counsel requested a more elaborate jury instruction tailored to the specific evidence of stalking and threats, the trial court would have been "well-advised to grant such a requested instruction if worded reasonably." (*Id.* at 18.) However, no such request was made, and the Appellate Division found "the absence of such an instruction did not constitute plain error under Rule 2:10-2 that leads us to reverse [Petitioner's] convictions." (*Id.* at 19.)

That a jury "instruction was allegedly incorrect under state law is not a basis for habeas relief." *Duncan v. Morton*, 256 F.3d 189, 203 (3d Cir.) (quoting *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991)), cert. denied, 534 U.S. 919 (2001). A petitioner can therefore only show entitlement

to habeas relief based upon allegedly inadequate jury instructions where the petitioner proves that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)). That a challenged instruction was "undesirable, erroneous, or even universally condemned," is insufficient to warrant habeas relief; a petitioner can only prevail on such a claim by showing that the instruction rendered his trial fundamentally unfair. *Id.* Additionally, courts may not judge the instruction in isolation, but must consider the instruction "in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72.

Where the error is the omission of an instruction, a petitioner's burden is "especially heavy" because an omission is "less likely to be prejudicial than a misstatement of the law." *Henderson*, 431 U.S. at 155. In such a case, a petitioner must demonstrate that the omission was so "inconsistent with the rudimentary demands of fair procedure" as to result in a miscarriage of justice. *See Smith v. Arvonio*, Civ. No. 93-25, 1994 WL 327123, *3 (D.N.J. June 24, 1994) (citing *Hill v. United States*, 368 U.S. 424, 428 (1962)).

Petitioner has failed to show, and the record does not support, that the omission of an instruction to the jury contrasting the permitted and prohibited purpose for which the jury might use the evidence of Petitioner's stalking and threatening Clarissa rendered Petitioner's trial fundamentally unfair. As explained above, in the month prior to the murder and arson, Petitioner sent Clarissa nearly 300 text messages and showed up at her home uninvited. The trial court admitted the evidence of Petitioner's threats and stalking, finding the evidence was close in time, similar in nature, and was "a continuous series of events initiated [Petitioner] to achieve a specific goal. (*See* ECF No. 9-20 at 13:24 to 14:3.) The Appellate Division explained that while the trial court analyzed the evidence of stalking and threats under Rule 404(b), once the trial court

12

determined that the evidence would be admissible in support of the murder and arson charges, the standard for determining its admissibility in the joint trial was controlled by N.J.R.E. 403, not N.J.R.E. 404(b). (ECF No. 9-6, *Gregorio*, No. A-5383-11T1 at 17.) The state court ruled that the evidence was admitted as proof of the stalking and terroristic threats crimes charged in the indictment. (*Id.* at 16.) Additionally, it was admissible as part of the State's proof of a sequence of acts that allegedly led directly to Petitioner's intrusion into Clarissa's house on September 1, 2009, and the resulting homicide of Christine and burning of the house. (*Id.*) The evidence was not admitted to demonstrate propensity nor did it involve uncharged acts or other crimes evidence. The Appellate Division's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law.

Given that the evidence showed a continuous series of events that led to the murder and arson, the state court's decision not to provide the jury with a limiting instruction did not render Petitioner's trial fundamentally unfair and was not "inconsistent with the rudimentary demands of fair procedure" as to result in a miscarriage of justice. *Hill*, 368 U.S. at 428; *see Duncan*, 256 F.3d at. 203. Petitioner is not entitled to habeas relief on this claim.

### B.  Ground Two: Trial Court Erred in Admitting Certain Testimony

Petitioner argues in ground two that the trial court erred in admitting Brandon Bigham's testimony about Petitioner's prior threat to burn down the Mariano home. (ECF No. 1 at 7.) Petitioner claims Bigham's testimony that he overheard Petitioner say "if I don't talk to your mom, I'll burn the house down . . ." should have been excluded under N.J.R.E 403. (*Id.*)

Petitioner raised this claim on direct appeal, arguing the evidence should have been excluded under N.J.R.E. 401 because it was not probative of Petitioner's alleged intent to start a fire for the purpose of covering up the homicide. (*See* ECF No. 9-6, *Gregorio*, No. A-5383-11T1

13

at 19.) Petitioner also argued the evidence was unduly prejudicial and should have been excluded under N.J.R.E. 403. *Id.*

The trial court held a hearing pursuant to N.J.R.E. 104, to consider the admissibility to Bigham's testimony. Bingham testified that, in the weeks prior to the homicide and arson he was on the phone with Christine and overheard Petitioner tell Christine that "he wanted to give [Clarissa] something and he would "burn this house down if [he] [did not] get to talk to [Clarissa.]" (*See* ECF No. 9-24 at 8:17 to 9:6, Trial Transcript 1/26/12.) Bigham testified that he recognized Petitioner's voice and he heard Christine address Petitioner as J.R. (*Id.* at 9:16-20.) The trial court admitted the evidence finding Petitioner's statement was "sufficiently close in time, it's highly probative, clearly relevant on several issues, motive being one of them," and "[i]n combination with the text messages, it is very, very probative." (*Id.* at 20:20-24.) The trial court added that, although it was prejudicial to Petitioner, there were "no other means by which the evidence was available to the State," and the "probative value clearly outweigh[ed] any prejudice to [Petitioner]." (*Id.* at 20:25 to 21:8.)

The Appellate Division found the trial court properly admitted Bigham's testimony, explaining:

> Preliminarily, Bigham's testimony did not violate the hearsay rule because statements of a defendant are not hearsay. *See* N.J.R.E. 803(b)(1) (statement by a party-opponent). [Petitioner's] alleged statement was highly relevant to his state of mind near the time of the homicide and murder. Burning down a house is not a typical response when one is angry about another person's conduct. The evidence had "a tendency in reason," *see State v. Burr*, 195 N.J. 119, 127 (2008), to prove that [Petitioner] had the requisite state of mind to commit such a crime a short time after Bigham allegedly heard the statement.
>
> With respect to application of Rule 403, the trial court's balancing of factors "is subject to the abuse of discretion standard, which sustains the trial court's ruling 'unless it can be shown that the trial

court palpably abused its discretion, that is, that its finding was so wide [of] the mark that a manifest denial of justice resulted.'" *Lykes*, supra, 192 N.J. at 534 (quoting *Green v. N.J. Mfrs. Ins. Co.*, 160 N.J. 480, 492 (1999)). We find no abuse of discretion in the court's ruling under Rule 403.

[Petitioner] argues that Bigham was not a credible witness, but his credibility was a matter for the jury to determine. Not only did the trial court instruct the jury with respect to issues raised about Bingham's credibility, it also instructed the jury to consider with caution whether or not [Petitioner] actually made the damaging oral statement and to "recognize the risk of misunderstanding by the hearer, or the ability of the hearer to recall."

In addition, as required by N.J.R.E. 104(c), the court instructed the jury: "If after consideration of all these factors, you determine the statement or statements were or were not actually made by the defendant . . . or that the statement is not credible, then you must disregard the statement." *See* Model Jury Charge (Criminal), "Statements of Defendant" (2010). Thus, acceptance or rejection of Bigham's testimony was fully and appropriately in the hands of the jury.

A trial court's ruling on the admission of evidence is "entitled to deference absent a showing of an abuse of discretion," which is to say, "a clear error of judgment." *State v. Brown*, 170 N.J. 138, 147 (2001) (internal quotation marks omitted). There was no error of judgment in admitting Bigham's testimony and permitting the jury to consider its credibility and probative value.

(*See* ECF No. 9-6, *Gregorio*, No. A-5383-11T1 at 19-21.)

Initially, the Court notes that this claim relies on state evidentiary law and Petitioner has not raised a constitutional ground for relief. Habeas relief is available for a "violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (1997). A state court's interpretation of state evidentiary rules does not meet this requirement, and this Court has no authority to interfere with the state court's ruling. *Estelle*, 502 U.S. at 71-72 (noting federal court cannot grant habeas relief based on belief that trial judge interpreted or applied state evidence rule incorrectly); *see also Leake v. Dillman*, 594 F. App'x. 756, 759 (3d Cir. 2014) (quoting *Kontakis*

*v. Beyer*, 19 F.3d 110, 117 n.12 (3d Cir. 1994) ("[A] state court's misapplication of its own law does not generally raise a constitutional claim."))

However, a state court evidentiary error may warrant habeas relief if its effect was so pervasive that the petitioner was denied the fundamental right to a fair trial. *See Estelle*, 502 U.S. at 67-70. Here, Petitioner has not established how the admission of the statement violated due process. As explained above, during a telephone call with Christine, Bigham heard her say, "that's weird, I see J.R." (*See* ECF No. 9-24 at 34:14-15, Trial Transcript 1/26/12.) Bigham testified he had spent time with Petitioner and recognized Petitioner's voice. (*Id.* at 7:14 to 8:16; 9:16-17.) Additionally, the record shows there was significant additional evidence admitted against Petitioner. Petitioner sent Clarissa hundreds of text messages in the weeks leading up to the murder and arson. Petitioner would show up at Clarissa's home unannounced. There was also testimony from Bigham that the morning of the murder and arson, he heard Christine's doorbell ring while he was on the phone with her. When Christine said, "who is it?" Bigham heard Petitioner say it was "J.R." (*Id.* at 31:20-25; 33:2-12.) Bigham also heard Christine open the door and Petitioner say he had something to give Clarissa. Bigham testified Christine "forcefully said, give it to me, I'll give it to her and then the phone hung up." (*Id.* at 31:22 to 32: 8.) Additionally, Petitioner was at the scene of the crime with Clarissa arrived there. (*See* ECF No. 9-22 at 44:22 to 45:1, Trial Transcript 1/24/12.) Testimony was admitted that Petitioner was in possession of Christine's cell phone at the crime scene. (*Id.* at 48:17-18.) Police arrested Petitioner at the crime scene and a lighter was found in his belongings. (*Id.* at 164:3-10.) Therefore, the admission of Petitioner's statement to Christine, even if erroneous, could not have rendered his trial fundamentally unfair. Petitioner fails to state a basis for federal habeas relief and this claim is denied.

### C. Grounds Three, Four, and Five: Ineffective Assistance of Counsel

Within grounds three and four Petitioner raises three claims of ineffective assistance of trial counsel. Petitioner alleges the following specific errors:

1. Trial counsel failed to speak with several witnesses and call them as witnesses for the defense;

2. Trial counsel failed to request a passion/provocation jury instruction; and

3. Trial counsel failed to make timely objections at trial.

(ECF No. 1 at 8-10.)

The standard governing claims of ineffective assistance of counsel is well established, as set forth by the two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984). To support an ineffective assistance of counsel claim under *Strickland*, a petitioner must first show "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must show counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential ... a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. A petitioner also must affirmatively demonstrate that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial ... whose result is reliable." *Strickland*, 466 U.S. at 687, 692–93; *Shedrick*, 493 F.3d at 299. "It is not enough for the defendant

to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. The petitioner must demonstrate "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299.

"Because failure to satisfy either [*Strickland*] prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002) (quoting *Strickland*, 466 U.S. at 697–98).

When a federal habeas petition under § 2254 is based upon an ineffective assistance of counsel claim, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). For § 2254(d)(1) purposes, "an unreasonable application of federal law is different from an incorrect application of federal law." *Grant*, 709 F.3d at 232. "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Id.* Federal habeas review of ineffective assistance of counsel claims is therefore "doubly deferential." *Id.* (quoting *Cullen*, 563 U.S. at 189). Federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)." *Grant*, 709 F.3d at 232.

### 1. Ground Three: Failure to Call Witnesses

Petitioner's third ground for relief alleges trial counsel was ineffective for failing to interview and call three witnesses for the defense. (ECF No. 1 at 8-9.) Petitioner argues trial counsel was ineffective for failing to speak to Ronald Lewis, Francis Lewis, and Diana Malesky. (*See id.*)

The Appellate Division denied this claim on collateral review. (ECF No. 9-16, *Gregorio*, No. A-3690-16T4 at 6.) The Appellate Division explained the witnesses were interviewed and provided statements to the police, in which two of the witnesses stated that they observed individuals outside of the residence on the date of the murder and one of the witnesses stated that he thought he observed the victim on the balcony of the residence smoking a cigarette. (*Id.*) The Appellate Division affirmed the PCR court's finding that the three witness did not provide exculpatory information. (*Id.*)

The PCR court provided the following details and analysis regarding this claim:

> As to [Petitioner's] first allegation, while the record is clear that counsel did not call the witnesses named by [Petitioner] here, there is no evidence submitted with this petition that establishes counsel failed to speak with them prior to trial. At the outset, it should be noted that each of the witnesses named, Ronald Lewis, Francis Lewis (phonetic), and Diane Malesky, gave formal statements to the Prosecutor's Office. Each statement was supplied to [Petitioner] in discovery. In the absence of a claim by [Petitioner] that counsel failed to review the statements, it is reasonable to assume that he did.
>
> A review of each of the statements reveals why counsel's decision not to call them would clearly fall within the range of acceptable competent trial strategy. Each of the three named witnesses gave equivocal statements. Ronald Lewis told the police "I think I saw Christine." And, later in the statement in response to the question, "Now you're pretty sure that it was her at the balcony having a cigarette?" Mr. Lewis responded "I think so, she is the most tiny thing in there, so I think it was her." It's clear that Mr. Lewis made an assumption based upon the size of the individual, rather than an identification. [Petitioner's] argument that, if true, Mr. Lewis's sighting of Christine at approximately 1 p.m. would have

"neutralized" the testimony, placing [Petitioner] at her home at the time of the murder. The undisputed facts render this argument meritless.

There is no doubt that the body of the victim was discovered by firefighters responding to the fire set in the home at approximately 4 p.m. Likewise, there is no dispute that an accelerant was used to initiate the fire. Also undisputed is the medical examiner's testimony that the victim had been murdered by strangulation prior to the fire and that a precise time of death could not be determined. Those facts were before the jury, consequently the jury could only have concluded that the victim had been killed sometime between the phone call testified -- testified to by her boyfriend, Mr. Bigham, at 10 a.m. and the discovery of her body at 4 p.m. There is also no dispute that [Petitioner] was present, met Clarissa in the front of the home, and entered the home immediately prior to the discovery of the victim. The evidence before the jury clearly established [Petitioner's] presence at the home, both at the beginning of that time period and at the end of that time period.

It must also be remembered that the fire in the home was initiated with an accelerant. No reasonable jury could've concluded the fire was initiated shortly after 10 a.m. and gone unnoticed for six hours. The record makes clear that the fire was started in an attempt to cover up the murder. There is no doubt that the murder -- murderer set the fire to cover his tracks. There is also no doubt that the fire was set shortly before 4 p.m. The inescapable conclusion is therefore, that the murderer was inside the home shortly before Clarissa returned from work, and would necessarily have been in the area of the home shortly before the discovery of the fire.

The facts establish that [Petitioner's] activities place him in the area at all times relevant. Even if Mr. Lewis's testimony had been presented, it would neither neutralize Mr. Bigham or lessen Mr. Bigham's relevance. Bigham's testimony set the earlier parameter in the relevant time sequence. The testimony relating to the discovery of the victim set the latest parameter. Lewis's testimony, as equivocal as it was, would have no impact upon the relevant time period, nor would it tend to exclude [Petitioner] as the murderer. Presenting Lewis's testimony and arguing its importance as here argued would require counsel to assert Bigham's testimony about the phone call to have been credible, thus conceding his presence at the home and in direct contact with the victim within the relevant time parameter. No other witness placed [Petitioner] there at that time.

Further, in this context, with evidence of [Petitioner's] stalking and level of antipathy towards the victim's family, counsel would have to explain why [Petitioner] had been at the house twice on the day of the murder, rather than simply meeting Clarissa outside the home by chance, helping her with her packages and subsequently offering his assistance to a friend. Given the problems associated with the proffered testimony, counsel's decision to challenge Bigham's credibility in an attempt to keep his client clear of the scene as opposed to squarely placing him at the scene cannot be said to have been ineffective.

As far as M[s]. Lewis's potential testimony is -- oh, Ms. Lewis's potential testimony is concerned, the result is the same. At best, her testimony could've established that during your relevant time period someone other than [Petitioner] was outside the home and rang the doorbell, which went unanswered. [Petitioner's] argument here that Ms. Lewis's testimony "could have placed another person at the scene, in close proximity to Christine Mariano's murder" is correct, but a non sequitur nonetheless. The murder took place inside the home and not on the sidewalk. There is no indication that this person gained entrance to the home or made contact with the victim. It was and is irrelevant, no point would've been made by her testimony.

Ms. Malesky's testimony falls into the same category. She stated she saw "a female" that "could have been" the victim outside the residence around 2:30 p.m. She was unable to state with any degree of certainty that the female she observed was in fact the victim. The testimony proffered here, considered separately or in the aggregate, did not have a reasonable chance of affecting the outcome of the trial and counsel was not ineffective as here heard.

(ECF No. 9-29 at 20:18 to 25:7, PCR Hearing Transcript.)

Under federal law, a failure to investigate potentially exculpatory evidence or witnesses may form the basis of ineffective assistance of counsel. *See Strickland*, 466 U.S. at 690-91; *see also Brown v. United States*, No, 13-2552, 2016 WL 1732377, at *4-5 (D.N.J. May 2, 2016). To successfully establish this claim, a petitioner "must make a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained . . . and whether such information, assuming admissibility in court, would have produced a different result." *See Brown*, 2016 WL 1732377, at *5 (quoting *United States v. Askew*,

88 F.3d 1065, 1073 (D.C. Cir. 1996) (internal quotation marks omitted)). The petitioner must also demonstrate he suffered prejudice. *See Strickland*, 466 U.S. at 690-91.

Here, in finding counsel's performance was not deficient, the state courts did not violate clearly established law, and were not unreasonable in their application of *Strickland*. The PCR court explained that all three witnesses gave equivocal statements. Ronald Lewis thought he saw Christine on her balcony but could not unequivocally say it was her. Diana Malesky saw an individual outside of the home who may have Christine. The PCR court explained that even if these witnesses had seen the victim outside of her home, based on the evidence summarized by the PCR court, these statements do not exclude Petitioner during the time period in which the fire was likely set. Francis Lewis stated she saw another individual outside of the home. However, this does not show that Petitioner was not inside the home where the murder and arson took place. These witness statements do not unequivocally exonerate Petitioner.

Petitioner has not established prejudice. To show prejudice, petitioner would have to demonstrate a substantial likelihood of a different result. *See Cullen*, 563 U.S. at 189. As explained in detail above, the evidence showed that Petitioner was at the scene of the crime earlier in the day and was there at the time the fire was discovered. Additionally, Petitioner was in possession of the victim's cell phone at the crime scene. Given the strength of the evidence against Petitioner, he is unable to show that he was prejudiced by the absence of these witnesses at trial.

On habeas review, this Court must provide "doubl[e] deferen[ce]" to the state court's disposition of ineffective assistance of trial counsel claims. *Davis v. Adm'r New Jersey State Prison*, 795 F. App'x 100, 102 (3d Cir. 2019), cert. denied sub nom. *Davis v. Johnson*, 140 S. Ct. 2748, 206 L. Ed. 2d 923 (2020) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). Petitioner has not met the high threshold required to establish that the Appellate Division's denial

of his ineffective assistance of counsel claim, based on the failure to conduct a meaningful investigation and present these three witnesses, involved an unreasonable application of *Strickland*. *See Lewis v. Horn*, 581 F.3d 92, 108 (3d Cir. 2009) (even if counsel's investigation and presentation of alibi defense was deficient, the strength of the evidence of guilt precluded reasonable probability that outcome of trial would have been different). As such, Petitioner's third ground for habeas relief is denied.

### 2. Ground Four: Passion/Provocation Jury Instruction

Petitioner's fourth ground for relief argues that trial counsel was ineffective for failing to request a passion/provocation jury instruction. (ECF No. 1 at 10.) Petitioner claims the state presented evidence showing that Petitioner was in love with Clarissa and was distraught that Clarissa would not speak to him. Petitioner also argues the state presented evidence that Petitioner arrived at Clarissa's home to drop something off for Clarissa and Christine tried to "shield" Clarissa from Petitioner. Petitioner claims there was a confrontation and that enraged Petitioner. Based on this, Petitioner argues trial counsel should have sought a passion/provocation jury instruction. (*See id.*)

As an initial matter, it is debatable whether the instant ineffective assistance of counsel claim was properly exhausted because Petitioner abandoned the claim on appeal to the Appellate Division. However, the Court need not determine if the claim is properly exhausted because a habeas court can, if appropriate, deny a petitioner's unexhausted claims on the merits pursuant to 28 U.S.C. § 2254(b)(2). *See* § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see also Mahoney v. Bostel*, 366 F. App'x 368, 371 (3d Cir. 2010). The Court's de novo review applies a more liberal standard in favor of Petitioner than AEDPA

23

deference. *See Harrington*, 562 U.S. at 101-102. Applying this more generous standard of review though, Petitioner is still not entitled to habeas relief on this claim.

Petitioner now argues trial counsel was ineffective for failing to request the passion/provocation jury charge. To determine if trial counsel's decision not to request the jury charge was below an objective standard of reasonableness, the Court reviews the underlying substantive claim. *See Strickland*, 466 U.S. at 688.

Since Petitioner failed to present evidence of a confrontation between Petitioner and Christine, he could not show adequate provocation necessary for a passion/provocation jury instruction. As such, he was not entitled to the jury charge. Under New Jersey law, passion/provocation manslaughter "occurs when a homicide which would otherwise be murder . . . is 'committed in the heat of passion resulting from a reasonable provocation.'" *State v. Galicia*, 210 N.J. 364, 378–79 (2012) (quoting N.J.S.A. 2C:11-4(b)(2)). Passion/provocation manslaughter has four elements: "(1) reasonable and adequate provocation; (2) no cooling-off time in the period between the provocation and the slaying; (3) a defendant who actually was impassioned by the provocation; and (4) a defendant who did not cool off before the slaying." *State v. Josephs*, 174 N.J. 44, 103 (2002) (citing *State v. Mauricio*, 117 N.J. 402, 411 (1990)); *Galicia*, 210 N.J. at 379–80. "As to the first element, the provocation must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *State v. Carrero*, 229 N.J. 118, 129 (2017) (internal quotation marks omitted) (quoting *Mauricio*, 117 N.J. at 413). "Words alone are insufficient to create adequate provocation, but the presence of a gun or knife can satisfy the provocation requirement." *Ibid.* (citations omitted).

At trial, Petitioner's counsel utilized the defense that a third party committed the murder and arson. (*See generally* ECF No. 9-25 at 32:12 to 48:1, Trial Transcript 1/31/12.) Here, Petitioner

states there was a confrontation between Christine and Petitioner, and it enraged Petitioner. However, Petitioner fails to point to any evidence in the record to show a confrontation took place. At most, the record shows that Christine told Petitioner to leave what he had for her mother, and Christine would give it to him. The record summarized above shows Clarissa was not home when Petitioner arrived at the home. As such, Christine was not actively "shielding" Clarissa from Petitioner. Under the relevant New Jersey law, the passion/provocation charge was not supported by the evidence as there was no evidence of provocation. Therefore, any request for a passion/provocation jury charge would have been meritless under New Jersey law.

Since the underlying substantive claim is meritless, trial counsel could not be ineffective for failing to request a charge to which the defendant was not entitled. *See Gov't of Virgin Islands v. Lewis*, 620 F.3d 359, 372 (3d Cir. 2010); *see also Johnson v. Folino*, 735 F.Supp.2d 225, 237 (E.D. Pa. 2010) (counsel could not have been ineffective for failing to request an instruction that was not warranted by the evidence presented.) As such, this ground for habeas relief is denied.

### 3.  Ground Five: Failure to Object to Hearsay

Petitioner's fifth ground for relief is raised under both ground three and ground four. (*See* ECF No. 1 at 8, 10.) In his fifth ground for relief, Petitioner argues that trial counsel was ineffective for failing to object to hearsay testimony. (*Id.*) Petitioner argues Christopher Mariano's testimony that his sister, Christine, had complained about Petitioner calling her all of the time and stalking their mother was hearsay and trial counsel should have objected.

Petitioner raised this claim on collateral appeal and the state court denied the claim. The PCR court agreed that Christopher Mariano's testimony regarding what Christine told him about Petitioner calling all the time was hearsay. (ECF No. 9-29 at 25:25 to 26:4. PCR Hearing Transcript.) However, the PCR court found the admission of this hearsay was "harmless and could

not have prejudiced [Petitioner] insofar as cell phone records of both the victim and [Petitioner] had been previously introduced into evidence and conclusively established that fact." (*Id.* at 26:5-8.)

Under *Strickland*, a defendant must establish prejudice stemming from counsel's inadequacy. Cathleen Rodriguez, a T-Mobile employee, testified at trial regarding the cell phone records of Petitioner, Christine, and Clarissa. (*See* ECF No. 9-28 at 9:12 to 32:11, Trial Transcript 1/25/12.) Ms. Rodriguez testified that Petitioner had sent Clarissa approximately 40 to 50 text messages on August 25, 2009. (*Id.* at 21:18 to 22:6.) Ms. Rodriguez explained Clarissa cancelled that cell phone on the same day. (*Id.* at 10:16 to 11:6.) Ms. Rodriguez also testified that there was a cell phone registered to Clarissa that was cancelled following the death of Christine and the reason for the cancellation was marked as "deceased." The records showed that Petitioner's cell phone number called that number eight times on August 27, 2009. (*Id.* at 12:20 to 13:18; 23:6 to 24:16.) Evidence that Petitioner repeatedly contacted Clarissa and Christine had already been submitted to the jury through phone records. Therefore, there is no prejudice arising out of Christopher Mariano's testimony that his sister, Christine, told him Petitioner was repeatedly calling her and their mother, Clarissa.

To satisfy the second prong of the *Strickland* test, a petitioner must "show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 446 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding." *Id.* Petitioner has failed to show that but for counsel's failure to object to Christopher Mariano's hearsay testimony, the result of his trial would have been different. The state court's adjudication of this claim was not an unreasonable application of *Strickland*. Petitioner is not entitled to relief on this claim.

**IV.    CERTIFICATE OF APPEALABILITY**

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of a state court proceeding unless he has "made a substantial showing of the denial of a constitutional right."  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right.  Therefore, no certificate of appealability shall issue.

**V.  CONCLUSION**

For the reasons stated above, Petitioner's petition for a writ of habeas corpus (ECF No. 1) is **DENIED**, and Petitioner is **DENIED** a certificate of appealability.   An appropriate order follows.

**Date:**  August 5, 2022

                                              */s/Brian R. Martinotti*
                                              **HON. BRIAN R. MARTINOTTI**
                                              **UNITED STATES DISTRICT JUDGE**